# UNITED STATES DISTRICT COURT

___SOUTHERN___  District of  NEW YORK

SHARON SPARK,

                    Plaintiff,

       –against–

DOW JONES & COMPANY, INC. LONG
TERM DISABILITY PLAN, DOW JONES
& COMPANY, INC., PLAN COMMITTEE,
as Plan Administrator, THE REED GROUP,
as Claims Administrator of the Long
Term Disability Plan, DOW JONES &
COMPANY, INC. HEALTH CARE PLAN,
DOW JONES & COMPANY, INC. LIFE
INSURANCE AND ACCIDENT BENEFIT PLAN
and AETNA LIFE INSURANCE COMPANY,

                  Defendants.
---------------------------------------------------X

## SUMMONS IN A CIVIL CASE

**Case Number:**

# 06 CV 15242

### JUDGE MARRERO

TO: (name and address of defendants)

    See attached sheet.

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY,
(name and address)

               **DeHAAN BUSSE LLP**
               **300 Rabro Drive**
                  **Suite 101**
          **Hauppauge, New York 11788**

an answer to the complaint which is herewith served upon you, within __20__ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default
will be taken against you for the relief demanded in the complaint. You must also file your answer
with the Clerk of this Court within a reasonable period of time after service.

**J. MICHAEL McMAHON**
_____
CLERK

_____
(BY) DEPUTY CLERK

DEC 18 2006
_____
DATE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHARON SPARK,                                              :

                Plaintiff,                  :

      –against–                                   :

DOW JONES & COMPANY, INC. LONG           :
TERM DISABILITY PLAN, DOW JONES          :
& COMPANY, INC., PLAN COMMITTEE,         :
as Plan Administrator, THE REED GROUP,   :
as Claims Administrator of the Long      :
Term Disability Plan, DOW JONES &        :
COMPANY, INC. HEALTH CARE PLAN,          :
DOW JONES & COMPANY, INC. LIFE           :
INSURANCE AND ACCIDENT BENEFIT PLAN      :
and AETNA LIFE INSURANCE COMPANY,        :

            Defendants.                     :

---

06 CIV 15242

Civil
Action No.:

JUDGE MARRERO

**COMPLAINT**

Plaintiff, Sharon Spark, by her attorneys, DEHAAN, BUSSE, BINDER & BINDER, L.L.P., for her Complaint against Defendants, the Dow Jones & Company, Inc. Long Term Disability Plan (the "LTD Plan" or "Dow Jones"), the Dow Jones & Company, Inc. Plan Committee (the "Committee"), as Plan Administrator, The Reed Group, as Claims Administrator of the LTD Plan, the Dow Jones & Company, Inc. Health Care Plan (the "Health Care Plan"), the Dow Jones & Company, Inc. Life Insurance and Accident Benefit Plan (the "Life Insurance Plan"), and Aetna Life Insurance Company ("Aetna"), hereby alleges as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is based upon 29 U.S.C. §§ 1132(e)(1) and 1132(f) which give the District Courts Jurisdiction to hear civil actions brought to recover benefits due under

the terms of several employee welfare benefit plans. In addition, this action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the District Court jurisdiction over actions that arise under the laws of the United States.

2.    Under the Employee Retirement Income Security Act of 1974 (hereinafter, "ERISA") (29 U.S.C. §§ 1001 *et seq.*), the employee welfare benefit plans at issue in this litigation must contain provisions for administrative or internal appeal of denial of benefits. Plaintiff has exhausted all administrative avenues of appeal and has received a final denial. Therefore, this matter is properly before this court for *de novo* judicial review under Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989).

3.    Venue is proper in this district pursuant to 29 U.S.C. § 1332(e)(2) which allows an action under Title I of ERISA, as amended, to be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found.

4.    Plaintiff's employment with Defendant existed within the jurisdiction of the Southern District of New York.

## STANDARD OF REVIEW

5.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "4" above, as if fully set forth herein.

6.    As detailed hereinafter, Plaintiff was denied a full and fair review of the denial of her Long Term Disability ("LTD") claim because Defendants breached their respective fiduciary duties, ignored the available medical documentation and exhibited bias, all culminating in an unconscionably arbitrary and capricious denial of Plaintiff's claim for

benefits.

7.    ERISA prohibits a benefit provider from breaching its fiduciary duty or operating under a material conflict of interest.  As described hereinafter, Defendants violated these provisions of ERISA.

8.    As a result of this failure to comply with the applicable ERISA Regulations, as promulgated by the U.S. Department of Labor, Defendant's decision must be reviewed *de novo*, and Plaintiff must be allowed to conduct extensive discovery to fully develop the "Administrative Record."

## NATURE OF ACTION

9.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "8" above, as if fully set forth herein.

10.    This is a claim seeking a declaration that Plaintiff is entitled to disability benefits, including income and continuing coverage, pursuant to the terms and conditions of the employee welfare benefit plans maintained by Dow Jones & Company, Inc. ("Dow Jones").  Among these disability benefits are rights to continued coverage under various other employee welfare benefit plans maintained by Dow Jones, including the Health Care Plan and the Life Insurance Plan.

11.    Defendants, the LTD Plan, the Health Plan and the Life Insurance Plan, provide group coverage, based on disability, for the benefit of employees of Dow Jones.  As Defendants are employee benefit welfare plans established and maintained by an employer or employee organization for the benefit of its employees, ERISA applies to this action.

Said benefits were effective at all times relevant hereto.

12.    Upon information and belief, benefits under the LTD Plan are paid from the Employee Benefits Plan Trust, which is solely funded and maintained by contributions from Dow Jones. Claims under the LTD Plan are administered by Dow Jones, the Committee and The Reed Group. Defendants, Dow Jones, the Committee and the Reed Group, have made all decisions on this matters.

13.    Upon information and belief, claims for Health Care Plan benefits are paid from the Employee Benefits Plan Trust, which is solely funded and maintained by contributions from Dow Jones. Claims under the Health Care Plan are administered by Dow Jones, the Committee, and The Reed Group. Defendants, Dow Jones, the Committee and the Reed Group, have made all decisions on this matter.

14.    Upon information and belief, claims for Life Insurance Plan benefits are paid by a group insurance contract from Aetna, premiums for which are provided by Dow Jones' contributions. Dow Jones pays the full premium for Basic Life Insurance coverage, while employee contributions for Supplemental Life Insurance coverage are made through payroll deductions. Claims under the Life Insurance Plan are administered by Aetna. Defendant, Aetna, have made all decisions on this matter.

## THE PARTIES

15.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "14" above, as if fully set forth herein.

16.    Plaintiff, Sharon Spark, was born on June 20, 1953. She currently resides at 1606 Caffrey

Ave., Far Rockaway, New York, NY 11691.

17.    Defendant, the LTD Plan, is an employee welfare benefit plan as defined by ERISA, and its terms and benefits are the subject of the instant litigation.

18.    The designated agent for service of process upon Defendant, the LTD Plan, is the Secretary of Dow Jones & Company, Inc., 1 World Financial Center, 200 Liberty Street, New York, NY 10281.

19.    Defendant, the Committee, is the designated Plan Administrator for Defendant, the LTD Plan.

20.    The designated agent for service of process upon Defendant, the Committee, is the Secretary of Dow Jones & Company, Inc., 1 World Financial Center, 200 Liberty Street, New York, NY 10281.

21.    Defendant, the Reed Group, is a Colorado corporation, which upon information and belief, is licensed to conduct business in the State of New York.

22.    The designated agent for service of process upon Defendant, the Reed Group, is its Corporate Headquarters, located at 10155 Westmoor Drive, Suite 210, Westminster, Colorado 80021.

23.    Defendant, the Health Care Plan, is an employee welfare benefit plan as defined by ERISA, and its terms and benefits are the subject of the instant litigation.

24.    The designated agent for service of process upon Defendant, the Health Care Plan, is the Secretary of Dow Jones & Company, Inc., 1 World Financial Center, 200 Liberty Street, New York, NY 10281.

25.    Defendant, The Life Insurance Plan, is an employee welfare benefit plan as defined by ERISA, and its terms and benefits are the subject of the instant litigation.

26.  The designated agent of legal service for Defendant, the Life Insurance Plan, is the Secretary of Dow Jones & Company, Inc., 1 World Financial Center, 200 Liberty Street, New York, NY 10281.

27.  Defendant, Aetna, is a Connecticut corporation, which upon information and belief, is licensed to conduct the business of insurance in the State of New York.

28.  The designated agent for service of process upon Defendant, Aetna, is its Corporate Headquarters, located at 151 Farmington Avenue, Hartford, Connecticut, 06156.

## STATEMENT OF FACTS

29.  Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "28" above, as if fully set forth herein.

### Plaintiff's Occupation:

30.  Plaintiff began employment with Dow Jones on November 14, 1988.

31.  Upon information and belief, Plaintiff performed the daily duties of her employment at 100 Avenue of the Americas, New York, NY 10013.

32.  Plaintiff's job title for Dow Jones at the time of her disability was Management Secretary.

33.  Plaintiff continued in this occupation until May 8, 2000, when her medical conditions rendered her disabled and unable to continue working.

### The Terms of the LTD Plan:

34.  According to the Summary Plan Description ("SPD"), benefits under the LTD Plan are

provided through contributions by Dow Jones to the Down Jones & Company, Inc.

Employee Benefits Plan Trust.  (SPD at p. 166)

35.    The LTD Plan, provides for payment of monthly income benefits to participants of the

LTD Plan who become "totally disabled" as defined by the LTD Plan.

36.    The Summary Plan Description (the "SPD") for the LTD Plan contains the following

definition of "totally disabled," relevant to this litigation:

> -    *During the first 24 months of LTD benefits, you are unable to do all of the duties of your regular job due to an illness or injury, and*
> -    *After 24 months of LTD benefits, your disability prevents you from doing any gainful work for which you are reasonably qualified by training, education or experience.*

(SPD at p. 82).

37.    The terms of the LTD Plan specify that the base amount of benefits due to Plaintiff is

sixty percent (60%) of monthly base salary.

38.    The SPD contains the following terms regarding reduction of benefits payable under the

LTD Plan, relevant to this litigation:

> *The other disability benefits that will reduce the amount payable from the LTD plan include:*
>
> -    *Disability or retirement benefits payable to you or your family from Social Security.*
> -    *Workers' Compensation or similar legislated benefits (including the monthly equivalent of a lump sum disability settlement)*
> -    *Any other payments provided by a compulsory benefit law, either in the U.S. or by a foreign government.*

(SPD at pp. 82-83).

39.    The SPD contains the following terms regarding Social Security benefits under the LTD

Plan, relevant to this litigation:

> *The Plan Administrator will estimate your monthly Social Security benefits, and deduct this estimated benefit from your gross LTD benefit until the Social Security Administration makes a final determination.*
>
> *The Social Security reduction will be based on the Social Security benefit that you receive when your LTD benefits are initially calculated; future increases in your Social Security benefit wil not change your benefit from the Dow Jones LTD Plan. Regardless of your benefits from other sources, your LTD benefit will not be reduced to an amount less than $50 a month.*

(SPD at p. 83).

40.     The SPD contains the following terms of the LTD Plan regarding a claimant's application for Social Security Benefits, relevant to this litigation:

> *All applicants for Dow Jones LTD benefits must apply for Social Security disability benefits. If you do not apply for Social Security Disability, your application for Dow Jones LTD benefits will be denied.*

(SPD at p. 83).

41.     The SPD contains the following terms of the LTD Plan regarding the "Qualification Period" for entitlement to LTD benefits, relevant to this litigation:

> *Generally, an employee must be continuously disabled for at least 180 calendar days before becoming eligible for LTD Plan benefits. (In most cases, you will receive STD benefits during this period.)*

(SPD at p. 84).

42.     Defendants, Dow Jones and the Committee, are responsible for the administration and distribution of benefits under the terms of the LTD Plan.

**Plaintiff's Disability:**

43.    For twelve (12) years prior to May 8, 2000, Plaintiff had carried the diagnosis of Systemic

Lupus Erythematosus ("Lupus").

44.    TABER'S CYCLOPEDIC MEDICAL DICTIONARY (18th Ed.) ("TABER'S") defines Lupus as:

> *A chronic autoimmune inflammatory disease involving multiple organ systems and marked by periods of exacerbation and remission. Its name is derived from the characteristic butterfly (malar) rash over the nose and cheeks that resembles a wolf's face. The disease is most prevalent in nonwhite women of childbearing age.*

(TABER'S at p. 1135-36).

45.    TABER'S describes the symptoms of Lupus thus:

> *Patients present with a wide diversity of clinical signs but polyarthralgia, polyarthritis, glomerrulonephritis, fever, malaise, normocytic anemia, and vasculitis of small vessels of the hands and feet causing peripheral neuropathy are the most common. Other signs include skin rashes after exposure to sunlight, pleuritic pain, interstitial lung disease, pericarditis, myocarditis, gastrointestinal ulcerations, and other problems caused by inflammatory changes of the blood vessels or connective tissue.*

(TABER'S at p. 1136).

46.    TABER'S describes the prognosis for patients afflicted with Lupus thus:

> *The prognosis depends on which organ systems are involved, how severely they are damaged, and how rapidly the disease progresses. Five-year survival rates are high (80% to 90%), but the average long-term survival is less than 15 years.*

(TABER'S at p. 1136).

47.    Lupus is a chronic disease affecting many organ systems and other parts of a person's

body over long periods of time. The various organ systems or body parts involved often

vary over time in both location and severity.

48.    Additionally, Lupus is a labile, or waxing-and-waning, type of condition. As a result of this fact, patients with Lupus often experience wide fluctuations in various lab tests used to monitor the existence and activity level of the disease.

49.    These fluctuations in disease markers are cyclical and chronic, as there is no known cure for Lupus. While there are a range of prescription drugs designed to treat the symptoms of Lupus, most of these medications have severe side effects.

50.    Plaintiff has a family history of Lupus.

51.    Plaintiff's medical history is significant for cervical cancer, childhood asthma, endometriosis and hypertension.

52.    At its onset, Plaintiff's Lupus manifested itself through symptoms of severe fatigue, alopecia, malar rash, erythematous rash widely distributed over the body, swelling of the hands and feet, cervical lymphadenopathy, pleuritic chest pain and dry eyes and mouth.

53.    As treatment for these conditions, Plaintiff was forced to take strong prescription medications, such as Prednisone and Plaquenil, Protopic and Vioxx.

54.    In April, 2000, Plaintiff again began suffering the physical effects of Lupus, which included increased joint pain, arthralgias and severe fatigue. Primary among these symptoms, however, was severe and chronic fatigue.

55.    This fatigue became the main symptom about which Plaintiff complained to her treating physicians from the period directly preceding the onset of her disability on May 8, 2000, and continuing to the present.

56.    On May 8, 2000, Plaintiff's symptoms – primarily her severe and chronic fatigue – had

become so profound that she could no longer continue working in her own, or any other, employment.

57.    Plaintiff has not engaged in any gainful activity since May 8, 2000.

58.    On July 25, 2000, Bruce Stein, M.D., wrote her employer stating that Plaintiff's medical conditions would prevent her from working until September 5, 2000. In his note, Dr. Stein specifically stated that Plaintiff should not return to work due to symptoms of increased fatigue and joint pain.

59.    In an August 29, 2000 Attending Physician's Statement ("APS"), Dr. Stein amended his recommendation, determining that Plaintiff should remain out of work until September 29, 2000.

60.    On September 26, 2000, Dr.Stein, Plaintiff's treating physician, wrote to her employer delaying her return to work until October 2, 2000, and requesting that her work duties be modified due to her medical conditions.

61.    On October 13, 2000, Sawat Losoponkul, M.D., noted that Plaintiff had been experiencing a rash behind her neck, with pruritus, and a swollen, painful node on the left side of her neck.

62.    On November 15, 2000, Plaintiff was examined by Soo Park, M.D. Dr. Park noted that Plaintiff had rashes, joint aches, hair loss, a swollen lymph gland, as well as leg, arm and foot pain. Based on his examination, Dr. Park confirmed that Plaintiff had moderate limitations in lifting, bending, standing, walking and pushing and pulling on arm controls, and listed her prognosis as fair.

63.    Plaintiff was also examined and treated by Young S. Hahn, M.D. and Stephen J. Haug,

M.D., regarding the rapid decrease in her vision between January and March 2001. The treatment notes from these physicians showed that Ms. Spark had mild retinal pigment epithelial (RPE) changes and a significant decrease in her color vision. The physicians felt that these vision problems were either secondary to Lupus or to Plaquenil toxicity.

64. Although the Plaquenil was a very important drug that Plaintiff took to slow the progression of her Lupus, the physicians nonetheless recommended that Plaquenil be discontinued in favor of another drug.

65. By letter of October 23, 2001, Dr. Stein explained that he had begun to evaluate Plaintiff for possible Fibromyalgia, which had theretofore not been investigated. In that letter, Dr. Stein stated that, although the lab testing had been negative for any specific indices of Lupus, Ms. Spark's increased fatigue, persistent arthralgias, and possible mixed connective tissue disorder made it impossible for her to work at that time

66. In a Multiple Impairments Questionnaire dated October 1, 2001, Dr. Losoponkul, diagnosed Plaintiff with Depression, Hypertension, Systemic Lupus and Maculopathy. Dr. Losoponkul gave Plaintiff a guarded prognosis. Dr. Losoponkul stated that Plaintiff could only sit for two hours per day, stand or walk for one hour per day and would have to take fifteen minute breaks every two hours. Further, Dr. Losoponkul opined that Plaintiff's symptoms would worsen were she to be placed in a competitive work environment. Lastly, Dr. Losoponkul stated that Plaintiff's pain and fatigue constantly interfere with attention and concentration.

67. On December 7, 2001, Arthur Gray, M.D., diagnosed Plaintiff with medial epicondylitis.

68. In or about December 2001, Plaintiff developed lymphadenopathy, for which she had a

biopsy and oncological consultation. Plaintiff was subsequently diagnosed with atypical lymphoid hyperplasia.

69. On January 24, 2001, Dr. Jhaveri, an Infectious Diseases specialist, reviewed Plaintiff's recent lab results and history and determined that her lymphadenopathy was probably secondary to her Lupus.

70. Another biopsy, from a different area, was performed on March 1, 2002, which also revealed lymphoid hyperplasia.

71. Due to the severity and unpredictability of her medical conditions, Dr. Losoponkul recommended that Plaintiff see a psychiatrist in or about March 2001.

72. Plaintiff, however, refused psychological treatment at that time, but she was again referred for such treatment by Dr. Losopankul on August 13, 2001.

73. Although Plaintiff was initially resistant to this second referral, as well, she was eventually forced to acknowledge the devastating psychological affect her continuing symptoms of Lupus and her inability to work were having on her.

74. As a result, Plaintiff began regular psychotherapy with Sablon Dartigue, M.D. in November 2001. Dr. Dartigue has since diagnosed Plaintiff with Major Depressive Disorder, and he prescribed Prozac and Ambien to help treat her condition.

75. By a Psychiatric/Psychological Impairment Questionnaire dated November 21, 2001, Dr. Dartigue, reiterated his diagnosis of Major Depressive Disorder, and listed Plaintiff's prognosis as guarded. Dr. Dartigue listed Plaintiff's primary symptoms as severe depression, anxiety, insomnia, social withdrawal, difficulty breathing and fatigue. Further, Dr. Dartigue stated that "[a]ny pressure will exacerbate the symptoms," and that

she is "incapable of even 'low stress.'"

76. On January 2, 2002, A. Gray, M.D., diagnosed Plaintiff with cervical radiculapathy.

77. On February 8, 2002, Plaintiff underwent a Magnetic Resonance Imaging (MRI) of her cervical spine due to her increasing cervical symptoms. This test revealed decreased vertebral height in the C3 through C7 vertebral bodies, as well as the much more severe findings of desiccated and bulging discs at C4-C5, C5-C6 and C6-C7, all causing impingement on the thecal sac.

78. In or about late May or early June 2002, Plaintiff developed cardiac symptoms.

79. Plaintiff underwent a Doppler 2D M-Mode echocardiogram with color, performed by Yanina Kotlyar, M.D., on June 8, 2002. Dr. Kotlyar stated that Plaintiff suffered from severe mitral valve regurgitation and left ventricle hypertrophy. These symptoms further directly exacerbate Plaintiff's severe and chronic fatigue.

80. In a letter dated September 16, 2003, Dr. Kotlyar stated:

> Due to poor circulation and multiple vascular infarctions at her fingers and toes she is unable to use her hands effectively, and will not be able to perform any type of job.

81. In an Attending Physician's Statement, dated June 3, 2004, Dr. Kotlyar stated that Plaintiff was unable to use her hands, was constantly fatigued and unable to sit or stand for prolonged periods of time. Dr. Kotlyar classified Plaintiff as having a Class 5 physical impairment; that is, that Plaintiff had severe limitation of functional capacity and was incapable of even functioning at a sedentary exertion level. Dr. Kotlyar stated that Plaintiff was not expected to be able to return to work, and that her prognosis was guarded.

82.  Plaintiff subsequently underwent another Doppler echocardiogram, this time performed by Javad Tabaee, M.D.  In his report, Dr. Tabaee stated that Plaintiff had a dilated left ventricle, with an end diastolic diameter of 60 mm and end systolic diameter of 39 mm. The report further noted moderately reduced LV contractility, an ejection fraction of about forty-one percent (41%) and trace mitral valve regurgitation.

83.  As treatment for her cardiac conditions, Plaintiff was further prescribed Diovan/HCTZ.

84.  As a result of her disability, Plaintiff has been unable to work since May 8, 2000.

**Plaintiff's Application for Short Term Disability Benefits:**

85.  Upon the onset of her disability, Plaintiff applied for Short Term Disability ("STD") benefits from Dow Jones pursuant to the STD Plan.  According to the STD Plan, Dow Jones makes the determination whether a claimant is disabled.

86.  Upon her application and the submission of medical documentation, Plaintiff was approved for STD benefits from May, 2000 through November 13, 2000 – the full six (6) month STD period provided by the STD Plan.

87.  The terms of the Short Term Disability ("STD") Plan includes the following term, entitled definition of Disability:

> *To receive STD benefits, you must be unable to perform all of the duties of your regular job due to an illness or injury.*

(SPD at p. 80).

88.  As the SPD makes clear, the definition of Disability found in the STD Plan, and the definition of Disability for the first twenty-four (24) months of the LTD Plan are

essentially identical. There is no difference between the two (*see supra*).

89.  Therefore, since there is no difference, whatsoever, between the definitions of Disability found in the STD Plan and the LTD Plan, a claimant who is approved for benefits under the STD Plan must, *de facto*, qualify for benefits under the LTD Plan for a minimum of 24 months, unless there is very compelling evidence of a marked and extremely abrupt improvement in the disabling condition (LTD benefits commence on the day after STD benefits end).

90.  There was no such improvement in Plaintiff's condition, but this fact was voluntarily ignored by the Dow Jones Committee pursuant to the direct advice of its advisor on LTD claims, Mr. Andrew Rosenthal. Mr. Rosenthal (a Dow Jones benefits specialist and advisor to the Committee) wrote an email to Tom McGuirl – a member of the Dow Jones Committee – on September 3, 2003 (the "2003 email").

91.  In this email, Mr. Rosenthal made the following parenthetical reference: *"(Because the Dow Jones STD Plan has a more liberal definition of disability than the LTD Plan, far more employees are approved for STD than LTD)"*

92.  It is readily obvious from a comparison of the definitions under the STD and LTD Plans that Mr. Rosenthal's statement is an utter prevarication. It would have been much truer to state that, because of Dow Jones' overwhelming desire to minimize it's financial liability, far more people are approved for STD than LTD.

93.  The fact that the Committee could possibly believe this lame excuse from Mr. Rosenthal sharply calls into question their competence to review claims under the Plans. It seems clear from this statement that none of the dozen of so members of the Committee had

even read the SPD pursuant to which they were supposedly vested with the exclusive discretion to render final determinations. If they had, they would have recognized the complete erroneousness of Mr. Rosenthal's statement.

94.     The section of the SPD covering **both** the STD Plan and LTD Plan is only nine (9) pages in total. It is absolutely unconscionable that the Committee members had not committed it to memory, let alone that they could possibly be swayed by such a gross misstatement of the Plan terms by Mr. Rosenthal.

## Plaintiff's Application for Social Security Benefits:

95.     Pursuant to the terms of the LTD Plan, described *supra*, Plaintiff applied to the Social Security Administration (the "SSA") for Social Security Disability ("SSD") benefits on or about October 10, 2000.

96.     The definition of Disabled applied by the SSA is established by statute, thus:

> The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, you must have a severe impairment(s) that makes you unable to do your past relevant work (see § 404.1560(b)) or any other substantial gainful work that exists in the national economy.

(20 C.F.R. § 404.1505(a)).

97.     Plaintiff attended a hearing on October 9, 2001, before Judge Seymour Fier, in which he presented evidence supporting her claim for SSD benefits.

98.     On January 25, 2002, Judge Fier made a Fully Favorable decision; that is, Judge Fier

determined that Plaintiff is totally disabled from any substantial gainful employment available in the national economy.

99.  The definition of Disability used by the SSA is far more stringent than that used by Defendant, the LTD Plan. As such, one who is Totally Disabled as defined by the SSA must clearly be considered Disabled pursuant to the LTD Plan.

**Plaintiff's Application for Permanent and Total Disability and**
**Waiver of Premium Benefits pursuant to the Life Insurance Plan:**

100.  Pursuant to the terms of the Life Insurance Plan, described below, Plaintiff applied to Aetna for Permanent and Total Disability ("PTD") benefits and Waiver of Premium ("WOP") benefits on or about October 10, 2000.

101.  The SPD contains the following terms regarding qualification for PTD benefits pursuant to the Life Insurance Plan, relevant to this litigation:

> *When Benefits Are Paid*
> *If you have been insured under the Basic Life Insurance Program (and Supplemental Life Insurance, if purchased) for at least one year and become totally and permanently disabled before age 60, you can receive PTD disability benefits from the Life Insurance Plan. This disability benefit is paid in addition to any Long-Term Disability benefits (see page 82).*
>
> *Amount of Benefit*
> *After you have been totally and permanently disabled for six months, you may elect to receive a lump sum or monthly PTD benefit from Aetna. You can receive:*
> *-      A lump sum benefit of $10,500 ($21,000 if you have purchased Supplemental Life Insurance), or*
> *-      A monthly benefit of $191 for 60 months ($382 per month if you have purchased Supplemental Life Insurance).*
>
> *You will be considered totally and permanently disabled if Aetna*

*determines that for the remainder of your life you will be unable to*
*work for pay or profit at any occupation.*

**Life Insurance Premium Waiver**
*If you qualify to receive PTD disability benefits from the Life*
*Insurance Plan, your Basic Life Insurance coverage in excess of*
*$10,500 (and Supplemental Life Insurance over $10,500, if*
*previously purchased) will continue at no cost to you, provided you*
*remain totally and permanently disabled as determined by Aetna.*

(SPD at p. 95).

102.   Following Plaintiff's application, her initial submission of medical records and Aetna's

investigation, Aetna drafted a letter to Dow Jones, dated October 24, 2000, stating that it

had approved Permanent and Total Disability and Waiver of Premium benefits on behalf

of Sharon Spark. A check for $10,500.00, made out to Plaintiff, was enclosed with this

letter, and Aetna asked that Dow Jones forward the check to Plaintiff.

103.   By letter, dated November 1, 2000, Dow Jones informed Plaintiff of Aetna's favorable

disability decision and forwarded Aetna's check for $10,500 to her. The letter also

informed Plaintiff that she still had $49,500 left in Life Insurance coverage, after the

$10,500 had been deducted therefrom, pursuant to the terms of the Life Insurance Plan.

104.   Thereafter, in or about November 2001, Plaintiff provided to Aetna further proof of her

continuing total and permanent disability pursuant to Aetna's request.

105.   Dow Jones gave no weight, whatsoever, to Aetna's acknowledgment that Plaintiff was

"totally and permanently disabled," despite the fact that Dow Jones actually forwarded

the $10,500 check for Permanent and Total Disability benefits to Plaintiff on Aetna's

behalf, and despite the fact that definition of disability for PTD benefits is far more

stringent than the one in the LTD Plan.

106. Plaintiff is unaware, at the present time, whether her Life Insurance coverage and Waiver of Premium benefit remains in force, pursuant to the terms of the Life Insurance Plan. Since the Life Insurance Plan terms state that such coverage will remain in force for so long as Aetna determines that Plaintiff continues to be totally and permanently disabled as defined by the Life Insurance Plan, and since the issue of Plaintiff's disability is central to the instant litigation, Plaintiff hereby seeks to have the status of her coverage clarified.

## AS AND FOR PLAINTIFF'S CAUSE OF ACTION FOR LONG-TERM DISABILITY BENEFITS PURSUANT TO THE LTD PLAN

107. Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "106" above, as if fully set forth herein.

108. At all times throughout Plaintiff's claim for LTD, and attendant, benefits through the Dow Jones employee welfare benefit plans, Dow Jones, specifically, as well as its agent, The Reed Group, have acted arbitrarily and capriciously in denying Plaintiff the minimum protections mandated by ERISA.

109. In fact, due to Dow Jones' utterly unconscionable administration of Plaintiff's claim, it was impossible for Plaintiff to prove her eligibility and entitlement to LTD benefits.

110. It is clear from a review of the correspondence contained in the claim file that Dow Jones and the Reed Group acted with such bias against Plaintiff's claim for benefits, and that Plaintiff was materially and detrimentally affected by said bias, that Defendants should not be allowed to shield themselves from this Court's scrutiny by virtue of the discretionary language in the Plans. Instead, due to the incredible bias shown by Dow

Jones and the Reed Group, this Court should review Dow Jones' decision to repeatedly deny her benefits *de novo*.

111.    The Court should find further support for a de novo review of this claim in the fact that LTD benefits are paid through The Dow Jones & Company, Inc. Employee Benefits Plan Trust (the "Trust"), which is solely funded by contributions made to Dow Jones. This fact causes Dow Jones to have to pay LTD benefits from its own coffers, since there must be a minimum level of funding to be maintained in the Trust, such that more benefits paid from the Trust would require that Dow Jones make contributions to replenish same.

112.    Due to the operation of the Trust, funds saved by not paying benefits from the Trust obviate the need for Dow Jones to make further contributions thereto, and thereby free up these funds to use for business operating expenses, dividends, etc. In light of the fact that profit maximization is the shibboleth of corporate society, it is clear that Dow Jones is operating under a  very real conflict of interest when administering LTD claims.

113.    Even the SPD, which is the only source of information for employees regarding the Dow Jones Plans, gives a very chilling foreshadowing of Dow Jones' incredible bias against paying any claims from its coffers. On page 82 of the SPD – right above the section entitled "Long-Term Disability Benefits" – a cartoon appears depicting a physician stating the following to a bed-ridden patient with an IV in his arm: "*It's your insurance company. They say you're cured.*"

114.    This cartoon, and the unconscionably arbitrary behavior it depicts and is ostensibly meant to satirize, is the very first thing a claimant would see when faced with a disability. While this would be fairly depressing to a disabled claimant to read, said cartoon

Page 21 of 49

becomes a source of great anger to a disabled employee when said employee goes through the claims process and realizes that Dow Jones, the Reed Group and the Committee engage in exactly this type of arbitrary and capricious claims denial.

115.    The cartoon is even more aggravating due to the fact that, since benefits under both the Health Care Plan and the LTD Plan are paid from the Trust, Dow Jones, the Committee and the Reed Group are "the insurance company."

116.    The foregoing, coupled with the very real evidence of Defendants' bias that materially and detrimentally affecting Plaintiff's claim – described in detail below – mandate that this Court review this claim *de novo*.


**Defendants' Wrongful Conduct in the**
**Administration of Plaintiff's Claim for Benefits:**

117.    In accordance with the terms of the LTD Plan, Plaintiff initiated her claim for LTD benefits by submitting a signed Claimant's Statement, dated October 10, 2000.

118.    At this time, Plaintiff was still receiving STD benefits pursuant to the terms of the STD Plan.  STD benefits were paid to Plaintiff until November 13, 2000.

119.    As stated above, the definition of disability contained in the STD Plan is functionally identical to the definition of disability found in the LTD Plan – specifically the STD Plan requires that a claimant be "unable to perform all of the duties of your regular job due to an illness or injury," while the LTD Plan (for the first 24 months) differs **only** in the substitution of the word "perform" for the word "do," in stating: "unable to do all of the duties of your regular job due to an illness or injury."

120.    While Plaintiff was still receiving STD benefits, Defendants required that Plaintiff

present herself to Dr. Robert Lesser for the purpose of conducting an "Independent"

Medical Examination in anticipation of her application for LTD benefits.  This

examination took place on September 21, 2000 – almost two (2) months prior to the end

of Plaintiff's STD period and the commencement of LTD benefits.

121.    Dr. Lesser submitted a report to Dow Jones, dated September 28, 2000, (the "Report") in

which he set forth his opinions regarding Plaintiff's medical condition.

122.    In the Report, Dr. Lesser stated:

> *In short there is insufficient data to support the diagnosis of Lupus*
> *at this time, which is not to say that she does not have it, but only*
> *that confirmation of this diagnosis is lacking.  For example if the*
> *ESR was high in the setting of profound fatigue then it is plausible*
> *to associate the two findings and establish reliable indices of*
> *disability.*

123.    Additionally, Dr. Lesser stated in the Report:

> *There are no obvious limitations of range of motion that would*
> *restrict her from full time work.  However, it must be understood*
> *that the component of fatigue can be severely subjectively limiting.*
> *Therefore, in absence of documentation the final answer to this*
> *question must pend the above requested test.*

124.    Further, Dr. Lesser's Report stated that "*[i]f lupus is the correct diagnosis, then her*

*prognosis is definitely guarded.*"

125.    As Dow Jones would later acknowledge during the appeals of Plaintiff's claim, Plaintiff

had provided medical documentation to Defendants that contained these very findings

that Dr. Lesser stated would – in the presence of profound fatigue – provide reliable

indices of disability.  Plaintiff had provided this documentation to Dow Jones in the form

of blood tests (covering a period of January to November 2000). These blood test included the very tests Dr. Lesser had specifically listed in the Report.

126.    Yet Dow Jones did not provide these blood tests to Dr. Lesser prior to his examination and drafting of the Report. In light of the sheer volume of these blood tests, and their importance to Plaintiff's claim, the only conclusion that can be drawn is that Dow Jones withheld them purposefully, in order to make it easier for Dr. Lesser to manufacture the evidence needed to deny the LTD claim.

127.    The Report was based entirely on a cursory examination of Plaintiff and a review of only a portion of Plaintiff's medical records. Yet, even during this brief exam, Dr. Lesser acknowledged and noted the "profound fatigue" from which Plaintiff suffers. Moreover, he even stated that "*[i]t must be understood that the component of fatigue can be severely subjectively limiting.*"

128.    Notwithstanding this clear advice to Dow Jones that it should consider Plaintiff's profound fatigue in its determination of her claim, there is no notation, whatsoever, in the claim file that indicates that Dow Jones, The Reed Group or the Committee ever considered it in any way.

129.    Despite this equivocal Report, which Dow Jones would use as the primary basis to deny Plaintiff's claim, Dow Jones continued to approve and pay Plaintiff's STD benefits for nearly another two (2) months – acknowledging that Plaintiff was "*unable to perform all of the duties of your regular job due to an illness or injury.*"

130.    It is especially important to note that Dr. Lesser's exam and Report predate Plaintiff's application for LTD benefits, which was not filed until on or about October 10, 2000,

because of the specific advice to the Committee from Andrew Rosenthal (discussed below) that the Committee should limit its consideration of evidence during the final appeal specifically to the period from November 2000 to February 2001.

131. Upon Plaintiff's appeal of Defendants' denial of her claim, Defendants requested that Dr. Lesser re-review the medical records. Dr. Lesser produced a report, dated March 11, 2003, documenting his conclusions based on this record review.

132. During this second review of medical records (without physical examination), Dr. Lesser reviewed the blood test results that Plaintiff had submitted to Dow Jones at the inception of her claim yet withheld from Dr. Lesser by Dow Jones. Upon reviewing the blood tests, Dr. Lesser noted that the findings *"in deed [sic.] demonstrate serological evidence of autoimmune disease."* As Dr. Lesser no doubt knows, Lupus is an autoimmune disease.

133. Again – just as in his first Report of September 2000 – Dr. Lesser acknowledged and documented Plaintiff's profound fatigue and again advised that *"[i]t must be understood that the component of fatigue can be severely subjectively limiting."*

134. As stated before, there is no evidence that Dow Jones, The Reed Group or the Committee ever considered the effects of such profound fatigue on Plaintiff's ability to work.

135. By a letter dated December 28, 2000, Ms. Kathy Kemenash of The Reed Group, recommended to Dow Jones that Plaintiff's claim for benefits be denied on grounds of insufficient medical documentation. Another Reed Group employee, Ms. Marian Frangella, also reviewed the file and – not surprisingly – agreed with Ms. Kemenash.

136. By letter, dated February 12, 2001, Dow Jones denied Plaintiff's claim for LTD benefits. In order to justify it's denial, the letter purported to excerpt directly from Dr. Lesser's

Report (the only opinion even remotely questioning disability). Dow Jones even had the

gall to actually set off the supposed excerpts in quotation marks in the denial letter. The

paragraph from the denial letter reads:

> *Dr. Lesser, Professor of Medicine at USHC completed a*
> *rheumatology consultation on 9/28/00 and "found no evidence of*
> *active Lupus". He also notes that, "there are no limitations that*
> *would restrict her from full time work".*

137.    It is absolutely unconscionable that Dow Jones would purposefully manufacture

quotations from Dr. Lesser's Report to suit their purposes. The first quotation, that Dr.

Lesser supposedly "found no evidence of active Lupus is a complete misquote. What Dr.

Lesser actually said was:

> *She also does not have any accompanying labs to support a*
> *diagnosis of active lupus, such as CRP, C3/C4, anti-ds, DNA titer*
> *or ESR. In short there is insufficient data to support the diagnosis*
> *of Lupus at this time, which is not to say that she does not have it,*
> *but only that confirmation of this diagnosis is lacking. For*
> *example if the ESR was high in the setting of profound fatigue then*
> *it is plausible to associate the two findings and establish reliable*
> *indices of disability.*

138.    Moreover, to the extent that Dr. Lesser felt that there was a lack of evidence of active

Lupus, it was completely due to the fact that Dow Jones' purposefully withheld the very

blood tests that Dr. Lesser claimed would confirm the diagnosis and "establish reliable

indices of disability" in the presence of Plaintiff's profound fatigue.

139.    The second quotation in that paragraph in the denial letter, claiming that Dr. Lesser had

stated that "*there are no limitations that would restrict her from full time work*" is even

more a totally self-serving fabrication than a misquotation. Since this sentence absolutely

goes to the heart of the disability question, its unscrupulous fabrication by Dow Jones is

incontrovertible evidence of material bias in administering this LTD claim. Dr. Lesser's actual quotation is a world away from Dow Jones' claims:

> There are no obvious limitations of range of motion that would restrict her from full time work. However, it must be understood that the component of fatigue can be severely subjectively limiting. Therefore, in absence of documentation the final answer to this question must pend the above requested test.

140.   The audacity of Dow Jones in completely fabricating the quotes from Dr. Lesser to suit its own purpose to deny this claim can not be ignored by this Court. The effect it had on Plaintiff's claim was immeasurable but surely fatal.

141.   As will be explained below, the effect of this bias is further compounded by the fact that Dow Jones purposefully chose to take no consideration of any medical documentation or argument submitted after, or regarding a period of time after, its February 12, 2001 denial of Plaintiff's claim.

142.   Because neither Plaintiff, nor the counsel she would subsequently retain, had any idea that this summary denial of her appeal had been so unscrupulously manufactured by Dow Jones, or that it would be upheld regardless of any medical documentation she might submit, Plaintiff appealed the February 12, 2001 denial of her claim by letter, dated February 21, 2001.

143.   Plaintiff submitted additional medical records concerning her appeal on February 29, March 9 and March 22, 2001, but none of it would make any difference to her LTD claim. Plaintiff's appeal, and the relevant medical documentation submitted in support thereof, would be **totally ignored** by Dow Jones and the Committee in their unconscionably biased and single-minded mission to deny Plaintiff's claim.

144. The only reason for this bias was simple greed. Most unfair of all was that his greed would also render all the work done by Plaintiff's attorneys for her final appeal to the Committee totally meaningless. The time of Plaintiff's counsel in preparation of the final appeal, as well as all the expense incurred by Plaintiff for such services, were totally wasted in the face of Dow Jones' incredible bias towards dismissing Plaintiff's claim.

145. This greed caused a conflict of interest so profound that it led Dow Jones to withhold the blood tests results from Dr. Lesser, ignore his clear advice to give weight to the effect of Plaintiff's profound fatigue and even ignore all the relevant medical documentation submitted by Plaintiff and her counsel from her first appeal to her final appeal before the Committee.

146. This last act by Dow Jones required that all of its employees involved literally deny the existence of **hundreds** of pages of relevant treatment notes and reports written by Plaintiff's treating physicians – all providing exactly the corroborative evidence of Plaintiff's testing, symptoms and sheer volume and frequency of treatment that Dr. Lesser stated would provide "reliable indices of disability."

147. This complete dismissal of such a volume of evidence was accomplished by Dow Jones' and the Committee's capriciously narrow focus on a totally arbitrary time frame that would made it impossible for Plaintiff to ever provide enough proof of the plethora of test results and ongoing symptoms that would allow her to actually document her labile and unpredictable disability from Lupus.

148. Dow Jones's unconscionable failure to consider Plaintiff's profound fatigue, as advised by Dr. Lesser, is evidenced by the complete lack of any notation in the claim file

indicating that her fatigue was ever considered. In sharp contrast, the evidence of Dow

Jones' voluntary and deliberate decision to ignore relevant medical documentation is

written in black and white.

149.    Andrew Rosenthal – a Dow Jones benefits specialist and advisor to the Committee –

wrote an email to Tom McGuirl -- a member of the Dow Jones Committee – on

September 3, 2003 (the "2003 email"), in which he expressly stated:

> *Please note that in making its final decision, the Committee*
> *should rely on information related to Sharon's medical condition*
> *during the period from November 2000 (when she first applied*
> *for LTD) through February 2001 (when Benefits issued it's*
> *denial letter). Any medical information based on Sharon's*
> *medical condition after February 2001 is not relevant: it is based*
> *on her more recent medical condition, and not on her condition*
> *at the time of her appeal.*

150.    This email was written just prior to Plaintiff's counsel's meeting with the Committee, in

which Plaintiff was ostensibly offered a final chance to appeal the denial of her claim. Of

course, due to the specific directive of the 2003 email, this final appeal, the relevant

medical documentation submitted with it and all the work that preceded it, would be

rendered meaningless.

151.    Although this email wasn't written by Mr. Rosenthal until just prior to the Committee's

final review of Plaintiff's claim, the institutional bias and single-minded desire to deny

Plaintiff's LTD claim that are evidenced by the email were quickly displayed by both the

Reed Group and Dow Jones' benefits department.

152.    Of course, the utter fabrication of the "quotations" from Dr. Lesser's Report found in the

February 12, 2001 denial letter showed that, even when Dow Jones supposedly

considered medical evidence, it would readily stoop to any level to "find" evidence to

allow it to limit its financial liability.

153. Despite Plaintiff's appeal and her submission of more relevant medical evidence, Ms. Denise Mayrer, a nurse with the Reed Group, wrote a letter dated April 6, 2001, in which she mirrored Ms. Kemenash's advice recommending that Plaintiff's claim be denied on grounds of insufficient medical documentation. This letter is nearly identical, *verbatim,* to the letter from Ms. Kemenash, dated December 28, 2000 that preceded the denial of Plaintiff's claim on February 12, 2001. This degree of mimicry is appalling – specifically for it's utter lack of medical commentary – especially in light of the fact that Ms. Mayrer was the only person at the Reed Group with any medical credentials who reviewed the claim before Plaintiff's final appeal to the Committee.

154. This shows just how cursory the Reed Group's review of the medical records was, and the degree to which the Reed Group's recommendation of denial was predetermined by Dow Jones' institutional bias. There was simply no doubt that the LTD claim was going to be denied.

155. Additionally, it is clear from a review of the claim file that Dow Jones and the Committee relied completely on the interpretation of the medical records and other evidence provided to them by the Reed Group. Every recommendation of the Reed Group (all almost identical) were engineered to give Dow Jones the ammunition it needed to be able to deny Plaintiff's claim. And every recommendation of the Reed Group was unequivocally adopted by Dow Jones with ignorant, servile devotion.

156. The most important reason behind this slavish following of the Reed Group's recommendations is that no one at Dow Jones, either in the benefits department , or on

Page 30 of 49

the Committee, has the requisite medical knowledge to form a reasonable opinion regarding the medical issues underlying disability.

157.   Every Dow Jones employee involved in this claim, including the dozen or so members of the Committee, were utterly dependent on the Reed Group to form their opinions for them. In this utterly dependent relationship, it is impossible for Dow Jones, or the Committee to have exercised the discretion with which the SPD supposedly invests the Committee.

158.   Never did the Committee considered the opinions of Dr. Lesser and the Reed Group, on the one hand, while considering on the other the opinions of Plaintiff and her treating physicians (who all concurred that she was disabled). Instead, there was only the one hand for Dow Jones. Only the recommendation of the Reed Group mattered to Dow Jones.

159.   Even more alarming is that only The Reed Group's interpretation of Dr. Lesser's opinion mattered. It appears that no one on the committee actually read and considered Dr. Lesser's, or any of the treating physicians', opinions without the second hand interpretation of these opinions by the Reed Group. This may explain why Dow Jones never followed Dr. Lesser's advice to consider Plaintiff's profound fatigue in making its decision. Since The Reed Group did not consider Plaintiff's fatigue, Dow Jones never considered it.

160.   Of course, the "advice" from the Reed Group was always the same, always biased towards the denial of Plaintiff's claim. This is clearly due to the fact that the Reed Group derive a very large monetary benefit from their function as Dow Jones' exclusive claims

administrator and medical advisor, and the fact that Dow Jones operates under a very strong conflict of interest between its fiduciary duty to Plaintiff under ERISA and its corporate survival by profit – a profit significantly increased by maintaining the Employee Benefits Trust through the systematic denial of claims under the Health Care and LTD Plans.

161.  By a letter dated April 19, 2001, Dow Jones, denied Plaintiff's appeal of her claim for benefits. However, rather than mentioning any direct medical evidence from either Dr. Lesser or any of Plaintiff's multiple treating physicians, Dow Jones' denial letter made multiple mention of the opinions of the Reed Group and even excerpted direct quotations from Ms. Mayrer's statements (which, as noted above, were taken almost verbatim from Ms. Kemenash's earlier review). Not one single reference was made to any doctor's opinion, or other direct medical evidence, in the letter of denial. As usual, Dow Jones blindly accepted the advice of the Reed Group – which was unchanged despite the submission of additional medical documentation.

162.  Dow Jones' denial letter of April 19, 2001 allotted Plaintiff sixty (60) days in which to file a final appeal to the Committee.

163.  By a letter dated June 1, 2001, Plaintiff filed her final appeal to the Committee.

164.  At approximately the same time, Plaintiff retained the services of this firm to represent her in her final appeal before the Committee.

165.  In a letter to Plaintiff dated October 18, 2001, to Plaintiff from Defendant, Defendant stated that Plaintiff had not pursued reconsideration and that the time for reconsideration was over. Further, Defendant stated that Plaintiff had submitted neither a written request

of appeal nor documents supporting an appeal.

166.   This last statement is obviously false, as is evident from the June 1, 2001, letter. However, Plaintiff's counsel was able to convince Dow Jones that their contentions were in error. As a result, Dow Jones agreed to consider the final appeal from Plaintiff to the Committee. Plaintiff was also afforded the opportunity to present her appeal to the Committee in person. Plaintiff's counsel subsequently availed itself of this opportunity, although as explained above, Dow Jones utterly ignored all medical documentation and other information submitted after the denial of Plaintiff's claim on February 12, 2001.

167.   Under cover, dated October 18, 2001, Plaintiff's counsel submitted over one hundred and fifty (150) pages of relevant medical documentation covering the period from late 1999 through 2001.

168.   Subsequently, On October 22, 2002, Plaintiff's counsel submitted a letter totaling twelve (12) single-spaced pages and containing detailed medical argument and careful citation to the portions of Dow Jones' claim file that were considered erroneous and that were felt to have led Dow Jones to render the wrongful denial of Plaintiff's LTD claim. Additionally, this letter was accompanied by more relevant medical documentation from various treating physicians supporting Plaintiff's inability to work. This additional medical documentation also totaled some one hundred and fifty (150) pages.

169.   Prior to the final appeal before the Committee, the claim was again referred to the Reed Group to inform Dow Jones how they should decide the claim. This time, an actual physician with an M.D. degree supposedly reviewed the claim. Of course, this review was invested with the same bias as the prior reviews, since the institutional mandate from

Page 33 of 49

Dow Jones to deny LTD claims was still firmly in place.

170.  Notwithstanding the degree of professionalism and thoroughness that one would be inclined to expect from a physician, Dr. James Lehayne scrawled a handwritten report to Dow Jones, dated May 20, 2003, in which he wrote:  ***I see no useful purpose to responding to the lengthy dissertation of Mr. Montas [Plaintiff's Counsel]."***

171.  To describe this "medical expert's" contribution to this claim as dismissive would be a gross understatement.  It was absolutely unconscionable that the only physician at the Reed Group to review this claim would give such short shrift to a detailed twelve (12) page letter from Plaintiff's counsel specifically and directly addressing the medical bases for Plaintiff's appeal of her LTD claim.

172.  Despite this clear evidence of institutional bias towards ignoring relevant medical evidence in order to assure the denial of Plaintiff's claim, Plaintiff's counsel nonetheless chose to go forward with the presentation of Plaintiff's final appeal to the Committee.

173.  While Plaintiff could not attend, due to her disability and the distance of her residence from the Committee's location in Princeton, New Jersey, Plaintiff's counsel appeared before the Committee on September 23, 2003, (the "Appearance").

174.  At the Appearance, Plaintiff's counsel presented even further medical records (for the period of September 2002 to April 2003) in support of Plaintiff's claim, as well as to actually explain to the Committee why Plaintiff felt that the denial of the LTD claim had been erroneous.

175.  The medical submissions and presentation given to the Committee at the Appearance were exhaustively prepared in anticipation of a fair and open review of Plaintiff's claim.

176.    However, much to the amazement of Plaintiff's counsel, no qualified medical expert was present at the Appearance. In fact, the Committee included no individual with the medical knowledge necessary to even understand much of Plaintiff's counsel's presentation or to render a reasoned decision on Plaintiff's claim for benefits.

177.    Moreover, no recording was made of the Appearance, nor were any notes or transcripts disclosed to Plaintiff.

178.    To Plaintiff's great detriment, the Committee was in possession of the 2003 email from Mr. Rosenthal instructing them essentially to ignore everything Plaintiff's counsel submitted at the Appearance and anything he said at the Appearance.

179.    As detailed above, the 2003 email stated that any medical documentation or evidence (including all the carefully drafted commentary in the twelve (12) page letter of October 22, 2002) regarding the period after February 2001 was to be ignored as irrelevant to the claim. However, the 2003 email expounded on this point and gave even more specific instructions to the Committee about which evidence to ignore:

> *Accordingly, Mr. Montas's last submission of May 28, 2003 consists entirely of medical records (hospital reports, doctors' reports, lab results and medication summaries) from September 2002 through April 10, 2003. As such, I believe that it should have no bearing on the Committee's discussions at its September 23 meeting, and should not be part of the review.*

180.    As would be expected in the face of such profound institutional bias, the Committee denied Plaintiff's final appeal of her LTD claim. Plaintiff was informed of this decision on December 22, 2003, when her counsel received a letter from Tom McGuirl, Treasurer for the Committee, dated December 19, 2003. This letter was utterly devoid of any

medical commentary and contained only the following reference to the Committee's decision: *"Yesterday, the Dow Jones & Company, Inc. Plan Committee met and decided to deny Ms. Spark's claim for long-term disability benefits."*

181. As no one with any medical knowledge was present on behalf of the Committee at the Appearance, and as Dr. Leyhane saw *"**no useful purpose to responding to the lengthy dissertation**"* of Plaintiff's counsel, and since the 2002 email from Mr. Rosenthal had so clearly advised the Committee to ignore any evidence presented at the Appearance, it is clear that Defendant had no intention of providing Plaintiff with any meaningful final appeal at all – let alone the "full and fair review" mandated by ERISA.

182. Moreover, since the SPD vests discretion in only the Committee, and the Committee was in utter dereliction of its fiduciary duty under ERISA by failing to exercise any independence whatsoever, it is clear that the Committee's "decision" should not be entitled to any deference from this Court. Therefore, this claim must be reviewed by this Court *de novo*.

183. Additionally, as no recording was made of the Appearance, it seems that Dow Jones and the Committee wished to put on a facade of a full and fair review while leaving no trail to indicate otherwise.

184. Had any of Defendants involved in the administration of this claim fairly reviewed the medical evidence submitted by Plaintiff and her counsel, it would have been apparent that the reservations that Dr. Lesser put forth in his report regarding Plaintiff's disability had been put to rest. In this case, Defendant would have no option other than to grant Plaintiff's claim for disability benefits.

185.    However, Defendants' clear institutional bias against Plaintiff was so strong that it caused exactly the opposite. Defendants' utterly arbitrary and capricious conduct in the administration of this claim assured that Dow Jones would be able to fulfil it's single-minded purpose to minimize its financial liability.

186.    While Defendants ostensibly reviewed the claim file on several appeals, said appeals were all totally illusory. Defendants presented a good facade to Plaintiff during her claim – which, fortunately for her in the context of this litigation – crumbles like angel food cake upon even cursory scrutiny. The sheer magnitude of Dow Jones' bias towards denying Plaintiff's LTD claim is literally written all over the file.

187.    Although Plaintiff has already listed a host of evidence demonstrating the fatal effect of Dow Jones' material bias against her, one more extremely shocking and very telling document highlights this bias in stark relief like nothing else in the claim file.

188.    Included in the documents provided to Plaintiff's counsel is the following email, dated November 7, 2002, from Andrew Rosenthal to Shelley Putvinski and carbon copied to Tom McGuirl, Wayne Monzo and Patricia Oliano of Defendants, the Committee and the Reed Group, (the "2002 email").

189.    This email was drafted to advise all recipients regarding how they should interpret the recently submitted twelve (12) page appeal letter from Plaintiff's counsel, dated October 22, 2002, and the 150 plus pages of medical documentation submitted therewith.

190.    The subject appearing at the top of the email was: "LTD Claim Appeal: Sharon Spark," and it included the hand-written note added after the email was drafted: *"Shelley \* Enjoy!! [signed] ASR [Andrew S. Rosenthal]"* This giddy salutation and good cheer was

a shocking contrast to the obvious personal animus directed towards Plaintiff's counsel in

the email.

191.    The text of the email is as follows:

> *Shelly: My apologies for the delay on this. I'm forwarding to you*
> *a very lengthy letter (with numerous attachments) from Sharon's*
> *attorney, Stephane Montas, in which he is submitting a formal*
> *appeal to [sic] our denial of Sharon's LTD Claim [sic]. Unlike*
> *his previous involvement in the case, this time he actually seems to*
> *have read the file and come up with some original ideas. Here are*
> *my comments on this material, and some suggestions on the next*
> *steps to have the appeal reviewed:*
> -        *While this does not affect our handling in any way,*
> *Stephane said he does want to meet with the Committee after the*
> *review is completed – assuming it is still not approved. Tom*
> *McGuirl assured him that he does have that right, either in-person*
> *or via a conference call.*
> -        *On page 2, he mentions that DJ and the Reed Group*
> *selectively ignored certain doctors' statements that Sharon is*
> *disabled. I don't agree with this conclusion; we quoted from four*
> *different doctors' reports. Perhaps Reed can respond to this*
> *specific charge.*
> -        *In many places throughout the letter, Stephane says that*
> *Dr. Lesser made his recommendation without seeing that lab test*
> *results from early 2000. Can you please ask Reed to determine if*
> *this is the case, and if so, to ask Dr. Lesser to conduct a re-review*
> *of the paperwork. Similarly, did Reed also review these lab test*
> *results? If not, they probably should. He made such a big deal of*
> *the missing lab results, that I want to either assure him it was done*
> *previously, or else take a first-time look at them.*
> -        *Which reminds me, and as you well know: An new IME is*
> *totally out of the question, as we are only considering her medical*
> *condition during the relevant time period in 2000 and 2001.*
> -        *One of his new concepts is that two years later [sic]*
> *Sharon now has a definite diagnosis of lupus. Of course, we do*
> *not make a disability decision based solely on the diagnosis. (For*
> *example, some HIV positive employees are not disabled.) But his*
> *point is that Dr. Lesser made the following statement: "If lupus is*
> *the correct diagnosis, then her prognosis is definitely guarded."*
> *This could be part of Reed's follow up with Dr. Lesser.*
> -        *My last comment relates to the Reed Group itself. Stephane*

*makes a lot of nasty comments about Reed's review, but that's just par for the course – I don't consider it a real problem. But, is it possible that other staff personnel at Reed can review this appeal, rather than the same group that handled it orginigally? If not, can we considered some other LTD company to review the paperwork? I would definitely want original analysis on this appeal, either at Reed or elsewhere.*
*Finally, lest you think I was overly impressed with Stephane's handling of the case, I will duly note that he forgot to make some word processing changes: Obviously, parts of the same letter were used for another client! Please pass this appeal on for review at your earliest convenience. Thanks and regards, ANDY.*

192.    The 2002 email is indicative of the "full and fair" review a claimant may expect to receive from Dow Jones and the Committee.

193.    The 2002 email indicates that Defendants' focus was on Plaintiff's counsel, rather than on the merits of Plaintiff's claim for LTD benefits.

194.    The 2002 email is evidence that Defendant, the Committee, was more intent on defending itself and the Reed Group than in providing a full and fair review of Plaintiff's claim for LTD benefits. As stated above, No one at Dow Jones possessed the requisite medical knowledge to understand Plaintiff's complicated medical condition, let alone to render a final decision determining Plaintiff's entitlement to LTD benefits. Therefore, Dow Jones chose to "circle the wagons" and blindly defend the Reed Group, upon whom it and the Committee had slavishly relied for direction on claims administration.

195.    The 2003 email indicates that Dow Jones and the Committee, were invested with such bias against Plaintiff that it was impossible for her to receive the full and fair review of her claim that ERISA mandates.

196.    The LTD Plan, and ERISA, establish a fiduciary relationship between Dow Jones, The

Committee and Plaintiff.

197.   This fiduciary duty requires that Defendant, the LTD Plan, pay Plaintiff LTD benefits in the event that she is totally disabled, as the term is defined by the LTD Plan, and that they provide a full and fair review of Plaintiff's claim if said claim is denied.

198.   Beginning on or about May 8, 2000, Plaintiff was rendered totally disabled, as the term is defined by the LTD Plan, and she remains totally disabled, as defined by the LTD Plan to the present day.  Plaintiff submitted to Dow Jones voluminous medical documentation to establish her disability, totaling nearly 400 pages, as well as providing evidence of her chronic and profound fatigue both directly and indirectly to Defendants.  This evidence was totally ignored, misread, misquoted, and blatantly rewritten in order to suit Dow Jones' and the Committees' single-minded purpose to deny Plaintiff's LTD claim.

199.   By obstinately and unjustifiably refusing to pay Plaintiff the benefits she is due under the LTD Plan, Defendants breached their fiduciary duty.

200.   By failing to give any weight to the opinions of Plaintiff's treating physicians, who all concurred that Plaintiff was totally disabled, Defendants breached their fiduciary duty.

201.   By slavishly adhering to the ill-conceived recommendations of the Reed Group, who has a direct financial stake in helping Dow Jones and the Committee deny Plaintiff's disability, Defendants breached their fiduciary duty.

202.   By failing to give any weight to Dow Jones' own prior determination that Plaintiff was totally disabled pursuant to the identical terms of the STD Plan, Defendants breached their fiduciary duty.

203.   By failing to give any weight to the SSA's determination that Plaintiff is totally disabled

under its more stringent definition of the term, Defendants breached their fiduciary duty.

204.    By failing to give any weight to Aetna's determination that Plaintiff was totally and

permanently disabled pursuant to the substantially more stringent standard necessary to

qualify for PTD benefits under the Life Insurance Plan, Defendants have breached their

fiduciary duty.

205.    As a result of Defendants' breaches of their fiduciary duties, and their failure to meet their

obligations under the terms of the LTD Plan and their undeniable bias towards denying

the LTD claim, Plaintiff is entitled to judgment against Defendants, the LTD Plan, the

Committee, and the Reed Group, together with payment of her LTD benefits in

accordance with the terms of the LTD Plan and ERISA, retroactive to November 13,

2000, up to the final date of this Court's determination.


## AS AND FOR PLAINTIFF'S CAUSE OF ACTION FOR
## DISABILITY BENEFITS PURSUANT TO THE HEALTH CARE PLAN

206.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1"

through "205" above, as if fully set forth herein.

207.    As a result of Plaintiff's employment with Dow Jones, Plaintiff was, at all times relevant

hereto, a covered participant of the employee welfare benefit plans established and

maintained by Dow Jones, including the Health Care Plan.

208.    The SPD contains the following terms regarding qualification for continuing coverage

under the Health Care Plan, relevant to this litigation:

*Health Care Coverage During Disability*
*Your health care coverage will continue while you are receiving short-term disability benefits and during the first six months of long-term disability benefits. If you are unable to return to work after receiving LTD benefits for six months, your employment will be terminated.*

*If your employment with Dow Jones terminates while you are receiving LTD benefits, your participation (and that of your eligible covered dependents) in the Dow Jones Health Care Plan will then continue for up to 18 more months after your termination date (for a total of 24 months of health care coverage while you receive LTD benefits). This period coincides with the period of extended health care coverage required under COBRA; however, Dow Jones goes beyond the law's minimum requirements and provided health care coverage for up to 24 months at no cost to you if you are eligible for LTD benefits. If you (or your dependent) are still disabled as defined by Social Security at the end of 24 months, you are eligible for an additional 5 months of COBRA coverage – fr a total of 29 months – provided you pay premiums of 150% of the cost of the cost of coverage for the last 5 months.*

*In addition, if you are not receiving LTD benefits at the time of your termination, but you or a member of your family electing COBRA coverage become disabled (as determined by Social Security) within the first 60 days of COBRA continuation coverage, continuing coverage for you or any other qualifying member of your family may be extended an additional 11 months beyond the original 18-month continuation period, provided that you notify Employee Benefits in South Brunswick before the end of the original 18-month continuation period and within 60 days of the Social Security disability determination.*

*When your 24 (or 29) months of extended coverage ends:*
- *If you are age 55 or over and had at last 10 years of service as of your termination date, you can continue to receive medical (but not dental) coverage through the Dow Jones Health Care Plan for retired employees. Depending on your age and length of service, this coverage will be fully or partially paid by Dow Jones.*
- *If you do not qualify for the Dow Jones Health Care Plan, you may convert your group insurance to an individual policy through Aetna U.S. Healthcare without having a medical examination.*

(SPD at pp. 61-62)

209.    Upon information and belief, Plaintiff either filed, or was prevented from filing, a claim
        under the Health Care Plan based on her total disability and her application for LTD
        benefits.

210.    However, if Plaintiff's claim under the Health Care Plan was not considered by the
        Committee, as Plan Administrator, it was through the fault of Defendants, not Plaintiff,
        who timely informed the Committee of her total disability when she filed her claim for
        LTD benefits under the LTD Plan and for PTD benefits under the Life Insurance Plan.

211.    Defendants' institutional bias towards denying any claims which are paid from its own
        coffers – such as LTD claims and Health Care Plan claims – as well as the requirements
        for receiving Health Care coverage during disability, inextricably linked these two Plans
        together and made it impossible for Plaintiff to receive a full and fair review of her claim,
        or to prove her entitlement to benefits under the Plans.

212.    Moreover, the attendant eligibility for continuing health care coverage, based on
        eligibility for LTD benefits provides an even greater incentive for Defendants to deny
        LTD claims than that already provided by Defendants' institutional bias.

213.    Based on her continuing total disability, as evidenced by her medical documentation, her
        qualification for total and permanent disability benefits under the Life Insurance Plan and
        her continuing receipt of Social Security Disability benefits, Plaintiff is eligible for
        continuing health care coverage, including the right to convert her group coverage to an
        individual policy, pursuant to the terms of the Health Care Plan.

## AS AND FOR PLAINTIFF'S CAUSE OF ACTION FOR DISABILITY BENEFITS PURSUANT TO THE LIFE INSURANCE PLAN

214.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1"

through "213" above, as if fully set forth herein.

215.    As a result of Plaintiff's employment with Dow Jones, Plaintiff was, at all times relevant

hereto, a covered participant of the employee welfare benefit plans established and

maintained by Dow Jones, including the Life Insurance Plan.

216.    Upon information and belief, Plaintiff was covered under both the Basic Life Insurance

Program and the Supplemental Life and AD&D Insurance Program, which are both part

of the Life Insurance Plan maintained by Dow Jones for the benefit of its employees.

217.    The SPD contains the following terms regarding qualification for PTD benefits pursuant

to the Life Insurance Plan, relevant to this litigation:

> ***When Benefits Are Paid***
> *If you have been insured under the Basic Life Insurance Program
> (and Supplemental Life Insurance, if purchased) for at least one
> year and become totally and permanently disabled before age 60,
> you can receive PTD disability benefits from the Life Insurance
> Plan. This disability benefit is paid in addition to any Long-Term
> Disability benefits (see page 82).*
>
> ***Amount of Benefit***
> *After you have been totally and permanently disabled for six
> months, you may elect to receive a lump sum or monthly PTD
> benefit from Aetna. You can receive:*
> -        *A lump sum benefit of $10,500 ($21,000 if you have
> purchased Supplemental Life Insurance), or*
> -        *A monthly benefit of $191 for 60 months ($382 per month if
> you have purchased Supplemental Life Insurance).*
>
> *You will be considered totally and permanently disabled if Aetna
> determines that for the remainder of your life you will be unable to*

*work for pay or profit at any occupation.*

**Life Insurance Premium Waiver**
*If you qualify to receive PTD disability benefits from the Life Insurance Plan, your Basic Life Insurance coverage in excess of $10,500 (and Supplemental Life Insurance over $10,500, if previously purchased) will continue at no cost to you, provided you remain totally and permanently disabled as determined by Aetna.*

(SPD at p. 95).

218.    Plaintiff's disability commenced on May 8, 2000.

219.    On or about October 10, 2002, Plaintiff filed a claim for PTD and WOP benefits under the Life Insurance Plan, based on her total disability.

220.    Plaintiff received a check for $10,500.00, evidencing her qualification for PTD and WOP benefits under the Life Insurance Plan.

221.    However, Plaintiff is unaware, at the present time, whether her Life Insurance coverage and Waiver of Premium benefit remains in force, pursuant to the terms of the Life Insurance Plan.

222.    Since the terms of the Life Insurance Plan state that such coverage will remain in force for so long as Aetna determines that Plaintiff continues to be totally and permanently disabled as defined by the Life Insurance Plan, and since the issue of Plaintiff's disability is central to the instant litigation and has been disputed by Dow Jones and the Committee, as Plan Administrator, Plaintiff hereby seeks to have the status of her coverage clarified.

223.    Based on her continuing total disability, as evidenced by her medical documentation, her qualification for total and permanent disability benefits under the Life Insurance Plan and her continuing receipt of Social Security Disability benefits, Plaintiff is eligible for

continuing PTD and WOP benefits, pursuant to the terms of the Life Insurance Plan.

# AS AND FOR PLAINTIFF'S CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY AND REQUEST FOR ADDITIONAL DISCOVERY

224.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "223" above, as if fully set forth herein.

225.   The foregoing demonstrates such hostility against Plaintiff's claim that it begs the question of what other hostile or derogatory documents were not included in the claim file, yet materially affected Dow Jones' decision to repeatedly deny Plaintiff's claims for LTD benefits.

226.   As no record exists regarding the Appearance, it is probable that there are other aspects of the claim administration process for which Defendants wished to leave no record. It is absolutely impossible to imagine that, at its final meeting, on December 18, 2003, the Committee did not have any discussions regarding the merits of Plaintiff's claim and regarding the course of action to be taken regarding her LTD claim.

227.   Since the Committee is the sole entity to which discretion is granted by the SPD, the substance any discussion had between the Committee members is absolutely material and relevant to the LTD claim, and to the instant action, and must be the subject of discovery in order for Plaintiff to be assured that this Court provides her with the full and fair review that Defendants utterly failed to provide.

228.   Additionally, although there are various letters from the Reed Group, upon which Dow Jones and the Committee slavishly relied, none of these letters evidences any kind of

thorough review of Plaintiff's medical records on its face. Since the advice of the Reed Group was both material and indispensable to Dow Jones and the Committee in making their decisions to repeatedly deny Plaintiff's LTD claim, Plaintiff must be allowed to conduct discovery from the various employees of the Reed Group who provided input into the LTD claims decision in order to assure that she is provided a full and fair review of her claim by this Court.

229.    Lastly, since the 2002 and 2003 emails from Andrew Rosenthal undeniably affected, if not directed, Dow Jones' denial of this claim, Plaintiff must also be allowed to take the deposition of Mr. Rosenthal to determine the extent to which Dow Jones' institutional bias against paying any claims from its coffers affected the administration of Plaintiff's LTD claim.

**WHEREFORE,** Plaintiff respectfully request that this Court enter judgement against Defendants, the Dow Jones & Company, Inc. Long Term Disability Plan, the Dow Jones & Company, Inc. Plan Committee, as Plan Administrator, The Reed Group, as Claims Administrator of the LTD Plan, the Dow Jones & Company, Inc. Health Care Plan, the Dow Jones & Company, Inc. Life Insurance and Accident Benefit Plan, and Aetna Life Insurance Company, as follows:

(A)    That the Court declare and then determine that, under the terms of the LTD Plan, Plaintiff has been totally disabled since May 8, 2000, within the LTD Plan's provisions, and that she continues to be totally disabled;

(B)    That after making such a determination, the Court grant Plaintiff appropriate legal and equitable relief and Order that Defendants, the LTD Plan and the Committee, pay Plaintiff's LTD benefits in accordance with the terms of the LTD Plan, retroactive to November 9, 2000 and continuing through the date of Judgment;

(C)    That the Court declare and determine that Plaintiff is disabled within the meaning of the Health Care Plan, and that she is eligible to receive continuing health care coverage, including the right to convert her group coverage to an individual policy – or in the alternative, that the Court Order that Defendants compensate Plaintiff for the reasonable value of her continuing health care coverage pursuant to the Health Care Plan;

(D)    That the Court declare and determine that Plaintiff is disabled within the meaning of the Life Insurance Plan and that she is eligible to receive continuing PTD and WOP benefits pursuant to the terms of the Life Insurance Plan – or in the alternative, that the Court Order that Defendants compensate Plaintiff for the reasonable value of her continuing Life Insurance coverage;

(E)    That the Court declare and determine that, due to Defendants' breach of their fiduciary duties, and due to the current incompleteness of the Administrative Record, Plaintiff is entitled to broad and extensive discovery from Defendants and that Defendants must provide same;

(F)    That the Court award Plaintiff her attorneys' fees pursuant to ERISA, 29 U.S.C. §1132(g);

(G)    That the Court Order that Defendant, the Committee, terminate any members found to be involved in the biased review of Plaintiff's LTD claim, in breach of their fiduciary

duties, so as to prevent harm to future claimants under the Dow Jones employee welfare benefit plans; and

(H)     That Plaintiff receive such other necessary and appropriate relief, including interest, costs and disbursements, that this Court may deem just, equitable and proper.


Dated: December 16, 2006
         Hauppauge, New York


                                        DeHaan, Busse, Binder & Binder, P.C.

                                        By: _____
                                        Patrick H. Busse, Esq. (PHB 1708)
                                        Attorneys for Plaintiff
                                        3000 Rabro Drive
                                        Suite 101
                                        Hauppauge, New York 11788
                                        Telephone: (631) 582-1200
                                        Facsimile: (631) 582-1228